UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| FRED S.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:20-cv-443 |
| | ) |
| KILOLO KIJAKAZI[2], | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**AMENDED OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Fred S., on December 3, 2020. For the following reasons, the decision of the Commissioner is **REMANDED.**

*Background*

The plaintiff, Fred S., filed an application for Disability Insurance Benefits on August 28, 2018, alleging a disability onset date of January 1, 2014. (Tr. 18). Fred S. later amended his alleged onset date to August 28, 2018. (Tr. 18). The Disability Determination Bureau denied Fred S.'s applications initially on January 2, 2019, and again upon reconsideration on March 20, 2019. (Tr. 18). Fred S. subsequently filed a timely request for a hearing on April 5, 2019. (Tr. 18). A hearing was held on December 2, 2019, before Administrative Law Judge (ALJ) Marc Jones. Vocational Expert (VE) Bob Hammond also appeared at the hearing. (Tr. 18). The ALJ

---

[1] To protect privacy, the plaintiff's full name will not be used in this Order.
[2] Andrew M. Saul was the original Defendant in this case. He was sued in his capacity as a public officer. On July 9, 2021, Kilolo Kijakazi became the acting Commissioner of Social Security. Pursuant to **Federal Rule of Civil Procedure 25(d)**, Kilolo Kijakazi has been automatically substituted as a party.

issued an unfavorable decision on December 19, 2019. (Tr. 18-25). The Appeals Council denied review making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

First, the ALJ noted that Fred S. met the insured status requirements of the Social Security Act through September 30, 2020. (Tr. 20). At step one of the five-step sequential analysis for determining whether an individual is disabled, the ALJ found that Fred S. had not engaged in substantial gainful activity since August 28, 2018, his amended alleged onset date. (Tr. 20).

At step two, the ALJ determined that Fred S. had the following severe impairments: obesity, osteoarthritis of the bilateral knees, and degenerative joint disease of the bilateral hips. (Tr. 20). The ALJ found that the above medically determinable impairments significantly limited Fred S.'s ability to perform basic work activities. (Tr. 20). Fred S. also alleged a disability due to hypertension, degenerative changes in his lumbar spine, anxiety, and depression. (Tr. 20-21). However, the ALJ indicated that these caused no more than a minimal limitation on his ability to engage in basic work activities and were non-severe impairments. (Tr. 20-21).

At step three, the ALJ concluded that Fred S. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21-22). The ALJ found that no medical evidence indicated diagnostic findings that satisfied any listed impairment. (Tr. 22).

After consideration of the entire record, the ALJ then assessed Fred S.'s residual functional capacity (RFC) as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel, crouch, and crawl. He can occasionally work in extreme cold, and occasionally in humidity and wetness. He can never climb ladders, ropes, or scaffolds, never work at unprotected

>heights, and never on wet, slippery surfaces, or dangerous or uneven terrain.  Every 60 minutes, he must be allowed to shift positions or alternate between sitting and standing for one to two minutes at a time while remaining on task.

(Tr. 22).  The ALJ explained that in considering Fred S.'s symptoms he followed a two-step process.  (Tr. 22).  First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a

\ acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Fred S.'s pain or other symptoms.  (Tr. 22).  Then he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Fred S.'s functioning.  (Tr. 22).

After considering the evidence, the ALJ found that Fred S.'s medically determinable impairments reasonably could have been expected to produce his alleged symptoms.  (Tr. 23).  However, he found that Fred S.'s statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 23).  The ALJ found the opinions of the State Agency Consultants (Consultants) to be persuasive in making his decision.  (Tr. 23).

At step four, the ALJ found that Fred S. was unable to perform any past relevant work.  (Tr. 24).  However, the ALJ found jobs that existed in significant numbers in the national economy that Fred S. could perform.  (Tr. 24).  Therefore, the ALJ found that Fred S. had not been under a disability, as defined in the Social Security Act, from August 28, 2018, through the date of his decision.  (Tr. 25).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are

3

supported by substantial evidence.  **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence.").  Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting ***Consol. Edison Co. v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see* ***Bates***, 736 F.3d at 1098.  A court must affirm an ALJ's decision if the ALJ supported her findings with substantial evidence and if there have been no errors of law.  ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  **20 C.F.R. § 404.1520**.  The ALJ first considers whether the claimant is presently employed and "doing . . . substantial gainful activity."  **20 C.F.R. § 404.1520(b)**.  If he is, the claimant is not disabled, and the evaluation process is over.  If he is not, the ALJ next addresses whether the claimant has a

4

severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 404.1520(c)**; see **Williams v. Colvin**, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. § 404.1520(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f);** see **Biestek v. Berryhill,** 139 S. Ct. 1148 (2019) (upon the disability benefits applicant's request, vocational expert's refusal to provide the private market-survey data underlying her opinion regarding job availability does not categorically preclude the expert's testimony from counting as "substantial evidence" but, instead, the inquiry is case-by-case).

      Fred S. has requested that the court remand this matter for additional proceedings. In his appeal, Fred S. has argued that the ALJ's RFC was not based upon substantial evidence. Specifically, he alleges that the ALJ erred by relying on outdated medical assessments and by failing to submit new evidence for medical scrutiny. Additionally, Fred S. claims that the ALJ erred in analyzing his subjective symptoms.

Of the two arguments, the court finds it necessary to address only the first.  Fred S. argues that the ALJ erred in relying on the Consultants' assessments because they were outdated and incomplete.  It is important to note that the Consultants' assessments were the only opinion evidence that the ALJ considered in coming to his decision.

On December 18, 2018, Dr. B. Whitley completed the first of the two assessments in this case.  Dr. Whitley opined that Fred S. had the residual capacity to lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand and/or walk for a total of about 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday.  (Tr. 56).  He further stated that Fred S. could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropers, or scaffolds.  (Tr. 57).  Dr. J.V. Corcoran completed the second assessment on March 19, 2019.  Dr. Corcoran affirmed Dr. Whitley's opinion and provided the same RFC.  (Tr. 68-70).  The ALJ found these opinions persuasive, noting that they were "supported by the objective evidence … and well explained" and consistent with the evidence in the record "from all other sources."  (Tr. 23-24).  The ALJ also noted that "physical examinations have been relatively benign," with intact musculoskeletal range of motion, intact strength, and no peripheral edema.  (Tr. 24).

Fred S. contends that new medical evidence relating to his hips and knees was submitted after the Consultants' assessments and was not reviewed by any medical source between the dates that the assessments were completed and his hearing on December 2, 2019.  He further claims that the evidence showed worsening impairments that supported further limitations that reasonably could have changed the Consultants' opinions.  Specifically, Fred S. alleges that the Consultants did not have access to the treatment notes of his orthopedist, Dr. Woods, the MRI of his left knee, or the x-rays of his hips and lumbar spine.

6

The Commissioner asserts that the ALJ did not err, as the ALJ provided greater functional limitations than those found by the Consultants. The Commissioner further responds that the new evidence did not constitute significant new evidence to show further limitations, and that the Consultants based their decision on evidence of imaging with similar findings.

An ALJ may not rely on outdated medical opinions "if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *see generally* **Lambert v. Berryhill**, 896 F.3d 768 (7th Cir. 2018); **Suetkamp v. Saul**, 406 F.Supp.3d 715, 721 (N.D. Ind. Aug. 27, 2019) (citing **Stags v. Astrue**, 781 F.Supp.2d 790, 749-96 (S.D. Ind. 2011) ("finding that the medical record omitted from review provided 'significant substantive evidence' regarding the claimant's medical impairments and that any medical opinion rendered without taking this record into consideration was 'incomplete and ineffective'")).

Dr. Whitney only reviewed evidence prior to December 2018, as that was when he provided his assessment. (Tr. 51-53). Dr. Corcoran reviewed additional evidence, including lab work from 2018, an x-ray from December 2018, and evidence from the Whiting Medical Center. (Tr. 64). Neither consultant reviewed the 2019 treatment notes from Dr. Woods, nor did they review the imaging from 2019. Treatment notes from March 2019 through July 2019 show: effusion (accumulation of fluid in the joint) in both knees; decreased range of motion in both knees; tenderness along the medial joint line and patella in the right knee; tenderness in the patella and lateral joint line in the left knee; a positive McMurray test[3] in the left knee; moderate swelling in both knees; crepitus with range of motion in both knees; and regular injections in both knees. (Tr. 274-76, 286-88, 294-96, 302, 304-306, 319-21). Fred S. also noted in 2019 that

---

[3] The McMurray test is used to test for meniscal tears in the knee. https://www.ptprogress.com/special-tests/knee-special-tests/mcmurray-test/ (visited November 4, 2021).

his injections only gave mild relief. (Tr. 301).

On January 29, 2019, x-rays were taken of Fred S.'s pelvis, hips, and lumbar spine. (Tr. 256). The x-rays of his pelvis and hips showed mild to moderate degenerative joint disease in both hips. (Tr. 257). The x-rays of his lumbar spine showed minimal retrolisthesis (backward slippage of vertebrae) of L2 on L3 and L3 on L4. (Tr. 258). The x-rays further showed multilevel prominent anterior and lateral endplate osteophytes in the lower thoracic and lumbar spine, prominent right lateral osteophytes at L1-L2, multilevel facet arthropathy (arthritis) in the lumbosacral region, mild disc space narrowing, and vascular calcification. (Tr. 258). The presence of osteophytes is significant, as osteophytes are bone spurs, generally caused by joint damage from osteoarthritis, which can cause pain, numbness, weakness, reduced range of motion, stiffness, tendonitis, and tendon tears. *See* https://my.clevelandclinic.org/health/diseases/10395-bone-spurs-osteophytes (visited November 4, 2021).

An MRI of the left knee taken on March 29, 2019 showed moderate thickening and abnormal intermediate signal of the quadriceps and patellar tendons. (Tr. 306). There was moderate-sized suprapatellar joint effusion. (Tr. 306). There was moderate thinning and irregularity of cartilage in multiple areas. (Tr. 306). Finally, Fred S.'s left knee showed multiple ligament tears. (Tr. 306). There was a small radial tear of the posterior horn of the medial meniscus, a complex horizontal tear of the posterior body and posterior horn of the lateral meniscus extending to the superior and inferior articular surfaces, and a radial tear that involves the posterior horn of the lateral meniscus. (Tr. 306). In brief, the MRI showed medial and lateral meniscal tears, tricompartmental arthritis with moderate-sized joint effusion, moderate quadriceps and patellar tendinosis, and partial tears of the patellar tendon. (Tr. 306). In reviewing the MRI, Dr. Woods did "not feel there [we]re any surgical indications" but

recommended continued injections and provided a prescription for hinged knee braces. (Tr. 307, 311).

The Commissioner asserts that although the Consultants did not review the 2019 MRI, they did consider the December 2018 x-rays, which the Commissioner argues showed similar findings. The December 2018 x-rays showed moderate to advanced tricompartmental arthritic changes and moderate to severe narrowing in the medial femorotibial compartment in the right knee. (Tr. 288). They also showed mild to moderate tricompartmental arthritic changes and mild narrowing in the medial and lateral femorotibial compartments in the left knee. (Tr. 288). The x-rays showed no significant joint effusion in the right knee, and small joint effusion in the left knee. (Tr. 288).

It is unclear how the Commissioner could reasonably conclude that these findings were similar to the 2019 MRI findings and therefore relieve the ALJ of his duty to submit the findings to medical scrutiny. The x-rays showed tricompartmental arthritic changes and narrowing of the femorotibial compartments with only small joint effusion. (Tr. 288). The MRI, however, showed a moderately sized joint effusion in the left knee. (Tr. 306). The MRI also showed three meniscal tears, one of which was noted to be complex. (Tr. 306). The MRI further showed moderate quadriceps and patellar tendinosis and partial tears of the patellar tendon. (Tr. 306). The only finding that is consistent between the two imaging reports is the finding of tricompartmental arthritic changes. (Tr. 288, 306). The MRI showed worsening joint effusion, as well as multiple meniscal and patellar tendon tears that were not noted in the 2018 x-rays. Moreover, the MRI showed moderate tendinosis in both the quadriceps and patellar tendons. These findings may have altered the Consultants' opinions and assessments. Therefore, the ALJ erred in relying on opinions that did not have access to "new, and potentially decisive findings."

***Stage v. Colvin***, 812 F.3d 1121, 1125-26 (7th Cir. 2016).

The Commissioner further asserts that Dr. Corcoran reviewed evidence of bilateral osteoarthritis of the hip and "other intervertebral disc degeneration" in the lumbar spine on reconsideration. (Tr. 66). However, these descriptions of Fred S.'s impairments were listed without any reference to the 2019 x-rays, and the x-rays were not indicated in the list of evidence reviewed. (Tr. 64-66). Moreover, the x-rays showed more than simply osteoarthritis of the hips, a diagnosis which offers no insight into how severe the osteoarthritis was in his hips. The x-rays indicated mild to moderate degenerative joint disease in both hips, which offers some insight into the level of severity of his hip impairment. (Tr. 257). "Other intervertebral disc degeneration" is equally vague in explaining Fred S.'s back impairments. (Tr. 66). The x-rays in question showed much more than disc degeneration. The x-rays showed multilevel prominent anterior and lateral endplate osteophytes, as well as multilevel face arthropathy. (Tr. 358). While the overall impression was "multilevel degenerative changes in the lumbar spine," the details of the x-ray showed more specific levels and severity of the degenerative changes. (Tr. 258). The Consultants did not have the opportunity to review these x-rays, which showed more specific severity and indicate more progressive degeneration than the evidence they reviewed.

The ALJ erred by relying solely on the Consultants' assessments because they did not have access to the new and significant medical evidence. The record contains evidence showing further degeneration and new impairments that came after the Consultants' assessments. The ALJ could not have accurately relied on the Consultants' findings when the Consultants did not have all of the relevant evidence.

The Commissioner also argues that the ALJ discussed the newer evidence throughout the decision, and therefore did not err in relying on the Consultants' assessment. That is irrelevant.

The issue does not lie in whether the ALJ discussed the new evidence but rather that he relied on opinions which were rendered before the new medical evidence became available, making his reliance improper. *See Moreno*, 882 F.3d at 728 (stating that an ALJ may not rely on outdated medical opinions "if later evidence containing, significant medical diagnoses reasonably could have changed the reviewing physician's opinion").

Furthermore, any assertion by the Commissioner that the ALJ considered the new evidence and included the appropriate limitations in the RFC is faulty. "When an ALJ denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion, and he may not 'play doctor' by using his own lay opinions to fill evidentiary gaps in the record." *Holsinger v. Commissioner*, 2018 WL 1556409, at *8 (N.D. Ind. Mar. 29, 2019) (citing *Chase v. Astrue*, 458 Fed.Appx. 553, 556-57 (7th Cir. 2012)); *Ayala v. Berryhill*, 2018 WL 6696548, at *1 (N.D. Ill. Dec. 20, 2018). Any interpretation of the 2019 imaging by the ALJ would be an example of "playing doctor," as the ALJ does not have the skills or the schooling to interpret MRI and x-ray evidence on his own.

Fred S. makes one other argument regarding his subjective symptoms. However, because the ALJ erred by relying on outdated medical assessments, the court need not address the additional argument at this time. The ALJ will have the opportunity to revisit these other issues on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 10th day of December, 2021.

/s/ Andrew P. Rodovich
United States Magistrate Judge